UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

PLH VINEYARD SKY LLC,                )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )   Case No. 2:23-cv-154
                                     )
VERMONT PUBLIC UTILITY               )
COMMISSION, ANTHONY ROISMAN,         )
MARGARET CHENEY, and RILEY           )
ALLEN,                               )
                                     )
          Defendants.                )

## OPINION AND ORDER

Plaintiff PLH Vineyard Sky LLC ("PLH" or "Plaintiff")
brings this action against the Vermont Public Utility Commission
("PUC") and PUC Commissioners Anthony Roisman, Margaret Cheney,
and Riley Allen (collectively "Defendants").  The First Amended
Complaint ("FAC") alleges that certain PUC rulings violated the
Takings Clause, constituted abuse of process, and deprived PLH
of its right to trial by jury.  The claims center on proposed
solar facility projects and other potential uses of properties
in Bennington, Vermont.  Defendants moved to dismiss the FAC,
arguing that PLH's claims are barred by sovereign immunity,
judicial immunity, lack of personal involvement by Defendant
Allen, and failure to state plausible claims.  The motion is
opposed.  For the reasons set forth below, the motion to dismiss
is granted.

**Factual Background**

PLH owns two adjoining real property parcels in Bennington, Vermont. The first parcel, located at the end of Willow Road (the "Willow Parcel"), is 27 acres. The second parcel is five acres and is located at the end of Apple Hill Road (the "Apple Hill Parcel"). Plaintiff's counsel, Thomas Melone, Esq., is the sole member of PLH. Melone is also the indirect whole owner of Allco Finance Limited ("Allco"), a Florida corporation that includes as members Chelsea Solar LLC and Apple Hill Solar LLC. ECF No. 10 at 1-2, ¶¶ 3-4.

Since 2013, the Willow Parcel has been the proposed site of two solar facilities, Chelsea Solar (through Chelsea Solar LLC) and Apple Hill Solar (through Apple Hill Solar LLC). PLH has no financial interest in either Chelsea Solar LLC or Apple Hill Solar LLC. PLH is instead the lessor of the land upon which the proposed facilities would be sited. *Id.*, ¶ 4.

In 2013, Allco sought standard-offer contracts for both facilities.[1] A standard-offer contract, pursuant to 30 V.S.A. § 8005a, cannot exceed 2.2 megawatts. 30 V.S.A. § 8005a(b). The PUC denied the petition, finding that the proposed facilities

---

[1] The PUC referred to Allco Renewable Energy Limited, Chelsea Solar LLC, Apple Hill Solar LLC, PLC Vineyard Sky LLC, and PLH LLC collectively as "Allco" or "petitioner" or "developer." ECF No. 19-2 at 3. When discussing proceedings before the PUC, the Court will similarly refer to those entities collectively as "Allco."

constituted a single 4.0 megawatt plant since "both proposals are located on the same parcel and have similar interconnection points." *In re Programmatic Changes to Standard-Offer Program*, 2014 VT 29, ¶ 7 (quoting Public Service Board ruling).  Acting on Allco's request for reconsideration, the PUC affirmed the ruling and explained that "[w]hile the projects may be operationally independent, they are still being advanced by the same developer, located on the same parcel of land, and adjoining each other.  Based on our review of the site plans ... it is reasonable to infer that they are a single plant." *Id*. Allco appealed to the Vermont Supreme Court, which found that the facilities were independent and that the entities were entitled to standard-offer contracts.  *Id.*, ¶¶ 10, 16.

Allco subsequently sought a Certificate of Public Good ("CPG") for both facilities.  In February 2016, the PUC denied the Chelsea Solar facility's petition, finding the "developer's proposals had significantly changed since 2013 and that the [two facilities] were now one 'plant' given their use of common electrical infrastructure agreed to by a common developer as part of a common development scheme."  *In re Chelsea Solar LLC*, 2021 VT 27, ¶ 13.  Allco appealed the ruling.  The Vermont Supreme Court affirmed the PUC, finding that as amended the "proposed facilities are not only commonly owned, physically contiguous, and designed to 'fit together,' but their

3

interconnection to the grid requires developer to construct a mile-long line extension at its own expense, the use of which will be shared by the facilities and which the PUC considered to be a single interconnection facility." *Id.*, ¶ 29.

In 2018, the PUC granted a petition for a CPG at the Apple Hill facility. A group of neighbors appealed to the Vermont Supreme Court, and the court reversed and remanded to the PUC for further proceedings. *In re Apple Hill Solar LLC*, 2019 VT 64, ¶ 41. While the PUC was considering the remanded petition, Allco filed a motion to amend. Among other things, the amended petition would remove a proposal for tree clearing and fencing, with Allco indicating that those actions would instead be undertaken as part of a sheep-farming operation on the 27-acre Willow Parcel. ECF No. 19-3 at 3. Allco also indicated that it planned to use the neighboring five-acre parcel for growing hemp. *Id.*

The PUC denied the motion to amend, finding that Allco "improperly sought review of questions outside [the Vermont Supreme Court's] limited remand order and that its request was untimely." *In re Apple Hill Solar LLC*, 2021 VT 69, ¶ 24. The PUC then denied the CPG petition for the Apple Hill facility, finding that it would interfere with orderly development of the region. *Id.*, ¶ 35. On appeal, the Vermont Supreme Court reversed in part and remanded. *Id.*, ¶ 67. On remand, the PUC

4

again denied the CPG petition.  As explained by the Vermont

Supreme Court in the subsequent appeal,

> [t]he Commission concluded that the placement of the
> proposed project in a prominently visible location on
> a hillside would result in undue interference with the
> orderly development of the region and have an undue
> adverse impact on aesthetics.  The Commission found
> that the potential benefits of the project did not
> outweigh these impacts because the State could realize
> similar benefits from other solar projects located in
> areas that did not run afoul of town and regional
> plans.

*In re Petition of Apple Hill Solar LLC*, 2023 VT 57, ¶ 9.  The

Vermont Supreme Court recently affirmed the PUC's CPG petition

denial.  *Id.*, ¶ 33.

On June 19, 2020, a private citizen filed public comments

alleging that there was tree clearing activity occurring on

Apple Hill at the sites of the two proposed solar facilities.

ECF No. 19-2 at 7.  The citizen also alleged that those

activities were disturbing an area of Apple Hill that had been

set aside for rare, threatened, and endangered species.  *Id.*  On

June 23, 2020, the Vermont Agency of Natural Resources ("ANR")

confirmed that site clearing was occurring on the 27-acre

parcel.  *Id.*  ANR's preliminary response to the citizen's

comments raised two concerns: first, that the site was being

prepared for electric generation without a CPG, and second, that

the clearing presented a "substantial and immediate harm to

'very rare' and 'rare' plants at the site."  *Id.*  Accordingly,

ANR sought a cease-and-desist order. *Id.* On June 24, 2020, the Vermont Department of Public Service commented that "cause appears to exist" to investigate whether the Apple Hill site was being unlawfully prepared for electric generation. *Id.* at 7-8.[2]

On June 26, 2020, the PUC held the first of two evidentiary hearings and issued a temporary restraining order barring Allco from conducting further site preparation on Apple Hill. The order was served at the site the next day. The PUC held a second hearing on December 4, 2020, and allowed certain post-hearing evidence thereafter. *Id.* at 9-10. On April 1, 2021, the PUC ruled that Allco had initiated site preparation at Apple Hill for electric generation in violation of 30 V.S.A. § 248(a)(2)(A) and enjoined further site preparation on the either the Willow Parcel or the Apple Hill Parcel. *Id.* at 32. The PUC

---

[2] While ordinarily a court considers only the facts pled in a complaint or documents attached to the complaint when deciding a motion to dismiss, courts "routinely take judicial notice of state administrative records." *Sahni v. Staff Attorneys Ass'n*, No. 14-cv-9873, 2016 WL 1241524, at *5 (S.D.N.Y. Mar. 23, 2016); *see also Evans v. N.Y. Botanical Garden*, No. 02 Civ. 3591, 2002 WL 31002814, at *4 (S.D.N.Y. Sept. 4, 2002) ("A court may take judicial notice of the records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary judgment."). A court may also consider a document outside the pleadings when plaintiff "reli[ed] on the terms and effect of [the] document in drafting the complaint" and the document is "integral to the ... [c]omplaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis omitted). Here, Plaintiff's claims are largely based on the administrative proceedings before the PUC and the resulting injunction.

further ordered that the injunction would remain in place until (1) the developer received a CPG for constructing an electric generation facility, or (2) the pending CPG petitions were finally denied, appeals periods had run, and both standard-offer contracts had expired or been voluntarily relinquished. *Id.*

Allco appealed the PUC's order. The Vermont Supreme Court dismissed the appeal for lack of jurisdiction because the PUC had not yet determined a civil penalty. *In re Investigation Pursuant to 30 V.S.A. §§ 30 & 209 into whether Petitioner Initiated Site Preparation at Apple Hill in Bennington*, 2021 VT 92, ¶ 16. In January 2023, Allco filed a new CPG petition for the Chelsea facility. The FAC alleges that the injunction is still in place, and that the PUC imposed a $5,000 civil penalty for alleged harm to the administrative process. ECF No. 10 at 15, ¶ 72.

PLH filed the instant action on June 26, 2023. The FAC alleges that the PUC's injunction "was *ultra vires* and defective from the start," *id.* at 15, ¶ 74, and has prevented Plaintiff from using the Bennington parcels "for any purpose, creating a forced conservation easement in favor of the PUC," *id.* at 2, ¶ 4. The FAC further alleges that "[t]he PUC's action also required it to ignore 50 years of contrary precedent in Vermont regarding what constitutes site preparation for a generating facility, as well as Plaintiff's absolute right in Vermont to

harvest trees, engage in agricultural activities, and construct a residential home." *Id.*, ¶ 5.  Finally, PLH claims that that the PUC process "obliterated [its] constitutional right to have a jury make findings of fact when [its] fundamental property rights are at issue." *Id.*

PLH submits that when it bought the two parcels, it expected to be able to use the land for solar activities or other purposes, including agriculture or residential development.  PLH reportedly owns land in other states, has explored solar development on those properties, and has employed uses that include solar energy production, residential development, and raising and managing sheep.  *Id.* at 3-4, ¶¶ 11-12.  At the time of the injunction, PLH had allegedly cleared limited space for installation of a silt fence related to agricultural use.  It had also removed dead ash trees and invasive brush to create two parking spaces.  *Id.* at 4, ¶ 14. PLH contends that by ordering a stop to such activities, the PUC undertook "a physical taking which is both unlawful and requires just compensation because it appropriates a recognized property interest through the imposition of a conservation easement." *Id.*, ¶ 15.

The FAC consists of three counts.  Count I alleges an unlawful taking in violation of the Fifth and Fourteenth Amendments and 42 U.S.C. § 1983.  Count II alleges abuse of

process, claiming that "Defendants Roisman and Cheney had an ulterior or illegitimate purpose to run Melone out of Vermont and squash the Chelsea and Apple Hill solar projects and in all events ca[u]se Plaintiff and Melone more economic harm." *Id.* at 37, ¶ 179. Count III claims violation of the right to trial by jury. This action is brought against the PUC, Roisman and Cheney in both their official and individual capacities, and Allen in his official capacity. *Id.* at 35, ¶¶ 153-155.

## Discussion

### I.   Motion to Dismiss Standard

Defendants move to dismiss the FAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The pleadings must offer more than "bare assertions," "conclusory" allegations, and a "formulaic recitation of the elements" of a claim. *Iqbal*, 556 U.S. at 681.

Rule 12(b)(1) requires that a case be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate it. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). PLH, as the party asserting subject matter jurisdiction, carries the burden of establishing by a preponderance of the evidence that jurisdiction exists. *Id.* When evaluating a Rule 12(b)(1) motion a court must accept all material factual allegations as true but, in contrast to review of a Rule 12(b)(6) motion, does not draw inferences in favor of the plaintiff. *See J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004).

## II.  Eleventh Amendment

Defendants first argue for dismissal under the Eleventh Amendment, focusing specifically on the Takings Clause claim.[3] Absent a waiver of sovereign immunity by the State, or express abrogation of that immunity by Congress under Section 5 of the Fourteenth Amendment, the Eleventh Amendment bars federal courts from adjudicating claims against the State, its agencies and

---

[3] Whether Eleventh Amendment immunity "constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense" has not yet been decided by the United States Supreme Court or the Second Circuit. *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) (citing *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 391 (1998)). Here, the Court need not decide whether the to review the motion under Rule 12(b)(1) or Rule 12(b)(6), since it draws all inferences in Plaintiff's favor and relies on pleadings and facts of which it may take judicial notice.

agents. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989). The bar applies "regardless of the nature of the relief sought," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 (1984), with the only exception being claims for prospective relief against state officials in their official capacities, *Ex parte Young*, 209 U.S. 123, 159–60 (1908).

The Second Circuit recently joined "the overwhelming weight of authority among the circuits" in holding that the Takings Clause does not abrogate state sovereign immunity where "the state provides its own remedy for an alleged violation." *74 Pinehurst LLC v. New York*, 59 F.4th 557, 570 (2d Cir. 2023). Vermont courts readily review takings claims, and the Vermont Supreme Court has noted that "the federal and Vermont Constitutions use virtually the same test for takings review." *Ondovchik Family Ltd. P'ship v. Agency of Transp.*, 2010 VT 35, ¶ 14. Moreover, Vermont has preserved its immunity to claims brought in federal court. *See* 12 V.S.A. § 5601.[4]

PLH argues that Vermont's takings remedy is "wholly inadequate" because "Vermont courts employ a *Chevron* on steroids

---

[4] Section 5601 of Title 12 waives sovereign immunity for tort claims. Plaintiff contends that in this case, the PUC has waived its immunity because it is liable for the torts of depriving him of the use of his property, trespass, and abuse of process. ECF No. 10 at 30. The only tort alleged in the FAC, however, is abuse of process. That cause of action is addressed below.

deference to administrative agencies." ECF No. 22 at 8. PLH is referencing the so-called *Chevron* doctrine, which states that federal courts should defer to a federal agency's permissible interpretation of an ambiguous or unclear statute when Congress has delegated administration of the statute to that agency. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). Although state courts are not bound by the *Chevron* doctrine, the Vermont Supreme Court does "give deference to the [PUC's] interpretation of statutes it implements and its rules." *In re Petition of GMPSolar-Richmond, LLC*, 2017 VT 108, ¶ 19 (citing *Grice v. Vt. Elec. Power Co.*, 2008 VT 64, ¶ 7 ("Absent a compelling indication of error, we will not disturb an agency's interpretation of statutes within its particular area of expertise") (quotation omitted); *In re Vt. Elec. Power Producers, Inc.*, 165 Vt. 282, 288 (1996) (court "give[s] great weight to the Board's interpretations of its own regulations") (quotation omitted)).

PLH is critical of such deference, arguing that "where a court makes no independent judgment and simply turns to the agency bureaucrats and asks what they think, you get results that make no sense." ECF No. 22 at 9. The Court acknowledges that in recent cases before the United States Supreme Court, *Chevron* deference has been subjected to similar criticism. *See, e.g., Loper Bright Enters., Inc. v. Raimondo*, 45 F.3d 359 (D.C.

Cir. 2022), *cert. granted in part*, 143 S. Ct. 2429.  That criticism, however, does not render the Vermont system inadequate.  The Vermont Supreme Court has made clear that notwithstanding agency deference, it will not "abdicate [its] responsibility to examine a disputed statute independently and ultimately determine its meaning."  *In re Programmatic Changes to Standard-Offer Program*, 2014 VT 29, ¶ 9 (citations and quotation marks omitted).  Moreover, the Vermont Supreme Court has not shied away from finding a "compelling indication of error," at times reversing the agency and remanding for further proceedings.  *Id.* at ¶¶ 10, 16.

Given that a takings claim brought in federal court is generally barred by state sovereign immunity, and as Vermont offers its own adequate remedy, the Court finds that Plaintiff's Takings Clause claims brought against the PUC must be dismissed. To the extent the Takings Clause claim seeks damages or other retrospective relief against the three Commissioner defendants in their official capacities, sovereign immunity bars those claims as well.  *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (noting that the *Ex parte Young* exception to immunity under the Eleventh Amendment "applies only to prospective relief, [and] does not permit judgments against state officers declaring that they violated federal law in the past").  Count I is therefore

13

dismissed as to the PUC, and as to the individual defendants insofar as Count I seeks retrospective relief against them in their official capacities.

## III. Judicial Immunity

Defendants next move to dismiss Plaintiff's abuse of process claims on the basis of judicial immunity.  ECF No. 19 at 16.  Those claims are brought against Defendants Roisman and Cheney.  ECF No. 10 at 37, ¶ 179.  The FAC alleges that both Roisman and Cheney acted with "an ulterior or illegitimate purpose to run Melone out of Vermont and squash the Chelsea and Apple Hill solar projects and in all events ca[u]se Plaintiff and Melone more economic harm."  *Id.*

It is well established that judges are absolutely immune from suit when a plaintiff seeks damages for actions taken within the scope of the judge's judicial responsibilities. *Mireles v. Waco*, 502 U.S. 9, 11 (1991).  Judges are also immune from claims for injunctive relief "unless a declaratory decree was violated or declaratory relief was unavailable."  42 U.S.C. § 1983.  "[T]he scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).  That said, judicial immunity does not apply when the judge takes action outside his or her judicial capacity, or when the judge takes action "in absence of jurisdiction."  *Mireles*, 502 U.S. at 9-10;

14

*see also Bliven v. Hunt*, 579 F.3d 204, 209-10 (2d Cir. 2009) (describing actions that are judicial in nature).

Judicial immunity has been extended to quasi-judicial officers, since the "role of the 'hearing examiner or administrative law judge ... is functionally comparable to that of a judge.'" *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999) (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)); *see also Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985). Such immunity applies to both federal and state administrative officials when sued in federal court. *See Gross v. Rell*, 585 F.3d 72, 80 (2d Cir. 2009) ("The cases indicate that the federal common law on judicial immunities applies even to state officials when they are sued in federal court on federal claims.").

Under Vermont law, the PUC "shall have the powers of a court of record in the determination and adjudication of all matters over which it is given jurisdiction. It may render judgments, make orders and decrees, and enforce the same by any suitable process issuable by courts in this State." 30 V.S.A. § 9. The Vermont Supreme Court has explained that although the PUC is "not a court in the strict sense," it "is an administrative agency that possesses quasi-judicial powers." *In re SolarCity Corp.*, 2019 VT 23, ¶ 13. This Court has previously held that Commissioners of the PUC, formerly known as the Public

15

Service Board, "are protected under the doctrine of quasi-judicial immunity."  *Condosta v. Vermont Elec. Co-op., Inc.*, 400 F. Supp. 358, 362 (D. Vt. 1975).[5]

Plaintiff alleges that Roisman and Cheney acted with "illegitimate purpose" and that their actions were therefore *ultra vires*.  The Supreme Court has held, however, that "judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial."  *Mireles*, 502 U.S. at 11-12 (citations omitted).  As noted, the only exceptions to judicial immunity are non-judicial acts or lack of jurisdiction.  *Id.*  Here, the PUC issued an injunction after two evidentiary hearings and the collection of significant evidence. There is no dispute that it was authorized to hold those hearings in its role as a "court of record," and to issue a binding decision.  30 V.S.A. § 9.  Plaintiff's claim of ill motive on the part of two Commissioners plays no role in determining their entitlement to judicial immunity.  *Mireles*, 502 U.S. at 11-12.

Plaintiff claims that the PUC acted without jurisdiction since there was no CPG in place at the time of the injunction.

_____

[5] In 2017, the Vermont Legislature changed the name from the Public Service Board to the Public Utility Commission. *See In re SolarCity Corp.*, 2019 VT 23, ¶ 1 n.1.

Defendants assert that the PUC was authorized to enforce the
requirements of 30 V.S.A. § 248(a)(2)(A), which prohibits site-
clearing activities for an electric generation facility in the
absence of a CPG.  The injunction ruling specifically considered
the PUC's jurisdiction over the matter, and concluded that
jurisdiction was proper:

> We have jurisdiction over Allco pursuant to 30 V.S.A.
> §§ 9, 10, 30, 203, 209, and 248, as well as Commission
> Rule 2.406 and Vermont Rules of Civil Procedure Rule
> 65.  Allco has two standard-offer contracts, and it is
> in active pursuit of CPG authorization to build two
> 2.0 MW solar electric generation facilities on Apple
> Hill in Bennington, Vermont, to take advantage of
> those standard-offer contracts.  Having submitted two
> petitions for CPGs for the proposed Chelsea
> Solar/Willow Road facilities and an original petition
> that was later amended for the proposed Apple Hill
> facility, Allco has been continuously engaged in
> seeking CPG authorization to build these facilities
> since it acquired the standard-offer contracts in 2013
> and 2014.  Allco's actions on Apple Hill continue to
> be part of Allco's plan to develop the site for the
> two facilities that are the subject of its standard-
> offer contracts.

ECF No. 19-2 at 17-18.  The PUC further reasoned that:

> [b]ecause Allco has not relinquished or let expire the
> two standard-offer contracts at the Apple Hill site —
> in fact, Allco has repeatedly sought and obtained
> extensions of the expiration dates of those contracts
> — and has not abandoned development of the facilities
> to be located there, Allco is subject to the
> Commission's jurisdiction pursuant to 30 V.S.A. §
> 209(a)(8).

*Id.* at 18.

Plaintiff takes issue with the PUC's conclusion, arguing
that the PUC could not impose any restriction on the land until

17

after the CPG was issued.  Allco made this same argument before
the PUC, which determined that as long as the company was acting
as part of a plan to sell renewable energy "using the standard-
offer contract, Allco is subject to the Commission's
jurisdiction.  Such actions by Allco include the filing and
amendment of any CPG petitions for the Apple Hill facilities,
and the clear-cutting activities that Allco was engaged in here,
and any other acts in preparation of the site for electric
generation."  *Id.* at 19.

The PUC also reasoned that given the statutory prohibition
against site preparation prior to obtaining a CPG, *see* 30 V.S.A.
§ 248(a)(2)(A), it must have jurisdiction over the site while
the application is pending.  "Otherwise, developers could submit
an application and, while it is pending, begin site preparation
in advance of receiving Commission approval, thereby mooting out
all review under the Section 248 criteria by the Department,
ANR, the Agency of Agriculture Foods & Markets, the Division for
Historic Preservation, and other agencies, interested parties,
and the Commission."  ECF No. 19-2 at 20.[6]

---

[6] Plaintiff disputes the PUC's jurisdiction over the five-acre
parcel, arguing that no solar facility was ever proposed for
that site.  The PUC concluded, however, that because the parcel
was included in the overall plan for those facilities,
specifically as the location for a row of trees to shield views
of the facilities from a neighboring property, the five-acre
parcel could be included in the injunction.  ECF No. 19-2 at 15.

18

Plaintiff further contends that jurisdiction was lacking because neither PLH nor any of the companies listed in the injunction constituted a "company" as defined by Title 30. Under, 30 V.S.A. § 209(a)(6), the PUC may restrain a "company" or "person."  The term "company" is defined as a person or entity "owning or conducting any public service business or property used in connection therewith."  30 V.S.A. § 201. Plaintiff argues that merely filing for a CPG does not constitute either the conduct of a public service business or the ownership of property for such a business.  The PUC considered this argument and found that "regardless of whether Developer also qualifies as a company," it was nonetheless a "person" as defined by 10 V.S.A. § 6001(14),[7] and was therefore subject to PUC jurisdiction.  ECF No. 19-2 at 19.

The PUC's conclusions with respect to jurisdiction were based upon legal analysis, and Plaintiff may disagree with those conclusions.  Whether the PUC's analysis was correct does not, however, determine the Commissioners' entitlement to judicial immunity.  "If judicial immunity means anything, it means that a

---

[7] A "person" under 10 V.S.A. § 6001(14) "shall mean an individual, partnership, corporation, association, unincorporated organization, trust or other legal or commercial entity, including a joint venture or affiliated Ownership; . . . [and] includes individuals and entities affiliated with each other for profit, consideration, or any other beneficial interest derived from the partition or division of land."

judge 'will not be deprived of immunity because the action he took was in error ... or was in excess of his authority.'" *Mireles*, 502 U.S. at 12-13 (quoting *Stump*, 435 U.S. at 356). "[T]he relevant inquiry is the 'nature' and 'function' of the act, not the 'act itself.'" *Id.* at 13 (quoting *Stump*, 435 U.S. at 362). The PUC plainly considered its jurisdiction while acting as quasi-judicial body under Vermont law. The nature of the ruling was itself quasi-judicial, and the Commissioners are protected by judicial immunity regardless of their conclusions. The abuse of process claims brought against Commissioners Roisman and Cheney are therefore dismissed.

## IV. Commissioner Allen

In the proceedings before the PUC, Defendant Allen reportedly recused himself from any involvement due to his prior work on related matters when he served as Deputy Commissioner of the Vermont Department of Public Service. Defendants therefore argue that he cannot be sued for the actions of the other two Commissioners.

With respect to claims for damages under 42 U.S.C. § 1983, Defendants are correct that such claims cannot proceed if the defendant was not personally involved. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

20

damages under § 1983.") (internal quotation marks and citation omitted).  That rule does not apply automatically when the plaintiff is seeking injunctive or declaratory relief and, as here, is suing a state official in his official capacity.  *See Davidson v. Scully*, 148 F. Supp. 2d 249, 254 (S.D.N.Y. 2001) ("Personal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under 42 U.S.C. § 1983.").  Nonetheless, Allen's continued recusal means that in the event the Court orders injunctive and/or declaratory relief, he cannot participate in providing such relief.  *See, e.g., Marshall v. Switzer*, 900 F. Supp. 604, 615 (N.D.N.Y. 1995) ("Actions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action.").

Plaintiff argues that so long as Allen retains the power to take action as a Commissioner, the claim against him is viable. The Court disagrees, so long as Allen remains recused from the matter.  Because Allen has not had, and presumably will not have any involvement in this matter, the claims against him are dismissed.  Moreover, for the reasons set forth below, the claims brought against all three Defendants fail as a matter of law.

**V.   Merits of the Takings Claim**

Defendants further argue that the FAC fails to set forth a plausible cause of action under the Takings Clause. Specifically, Defendants argue that Plaintiff subjected its properties to the statutory site-clearing restrictions. Defendants further submit that the injunction does not constitute the sort of invasion of land required for a physical taking, and does not meet the requirements for a regulatory taking.

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amends. V, XIV, § 1.  That requirement applies to all physical appropriations of property by the government.  *See Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015).  "The law recognizes two species of takings: physical takings and regulatory takings."  *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006).  A physical taking "occurs when there is either a condemnation or a physical appropriation of property."  *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 263 (2d Cir. 2014) (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002)).  "A regulatory taking, by contrast, occurs where even absent a direct physical appropriation, governmental regulation of private property 'goes too far' and is 'tantamount

22

to a direct appropriation or ouster.'" *1256 Hertel Ave. Assocs.*, 761 F.3d at 263 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005)); *see also Meriden Tr. & Safe Deposit Co. v. F.D.I.C.*, 62 F.3d 449, 454 (2d Cir. 1995) (a regulatory taking is governmental action that essentially "effects a taking").

### A.   Physical Taking

"When the government effects a physical appropriation of private property for itself or another — whether by law, regulation, or another means — a *per se* physical taking has occurred." *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 550 (2d Cir.), *cert. denied sub nom. Cmty. Hous. Improvement Program v. City of New York, New York*, 144 S. Ct. 264 (2023) (citing *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021)).  For there to be a physical taking, the government must occupy a person's land or cause someone else to do so.  *See Tuthill Ranch, Inc. v. United States*, 381 F.3d 1132, 1136 (Fed. Cir. 2004) (noting that "the sole question governing physical takings is whether or not the government has physically occupied the plaintiff's property"); *Canal Elec. Co. v. United States*, 65 Fed. Cl. 650, 653 (2005) ("The Government must occupy a person's land or cause someone else to do so for a physical taking to occur, however.").  "The caselaw is exceptionally clear that legislatures enjoy broad authority to regulate land use without

running afoul of the Fifth Amendment's bar on physical takings."
*Cmty. Hous. Improvement Program*, 503 U.S. at 527.

Plaintiff compares this case to *Cedar Point*, arguing that
the PUC's injunction imposed a physical taking "because it
appropriates a recognized property interest through the
imposition of a conservation easement."  ECF No. 22 at 14.  In
*Cedar Point*, the Supreme Court considered a regulation granting
labor organizations the right to access an agricultural
employer's property to solicit support for unionization.  594
U.S. at 143.  The Court held that because the regulation granted
a right to "invade" the grower's property, it amounted to a *per
se* physical taking.  *Id.* at 149.

Here, there was no such government-sanctioned "invasion."
*See, e.g., Cmty. Hous. Improvement Program*, 59 F.4th at 551–53
(holding that city's rent stabilization law was "readily
distinguishable" from the regulations in *Cedar Point* that
"compel[ed] invasions of property closed to the public").
Specifically, the PUC's injunction did not allow the government
or anyone else special access to Plaintiff's property.[8]  To the
contrary, the PUC sought to stop Plaintiff and third parties
from engaging in site clearing so long as the standard-offer

_____

[8]  The arrival of police officers to enforce the injunction does
not factor into the takings analysis, since those officers would
already have the power to enforce the law on private land.

contracts were in place and the CPG application was pending.
Accordingly, there was no physical taking.

### B.   Regulatory Taking

Plaintiff also argues that the injunction constituted a
regulatory taking.  A regulatory taking occurs "when the
government acts in a regulatory capacity" to infringe on an
individual's property rights.  *Buffalo Tchrs.*, 464 F.3d at 374.
As noted above, a regulatory action will only be recognized as a
taking when the "regulation goes too far."  *Pennsylvania Coal
Co. v. Mahon*, 260 U.S. 393, 415 (1922).

In determining whether a use restriction effects a taking,
the Court applies the balancing test set out in *Penn Central
Transp. Co. v. City of New York*, 438 U.S. 104 (1978).  That test
focuses on three factors: (1) "the economic impact of the
regulation on the claimant," (2) "the extent to which the
regulation has interfered with distinct investment-backed
expectations," and (3) "the character of the governmental
action."  *Id.* at 124; *Buffalo Tchrs.*, 464 F.3d at 375.

Here, any economic impact is the result of the pending CPG
application.  Defendants properly note in their briefing that
the injunction merely bars Plaintiff from engaging in other,
ancillary uses while the site is under formal consideration as a
location for electric generation.  As the Supreme Court held in
*United States v. Riverside Bayview Homes, Inc*.:

25

> [T]he mere assertion of regulatory jurisdiction by a
> governmental body does not constitute a regulatory
> taking.... A requirement that a person obtain a
> permit before engaging in a certain use of his or her
> property does not itself "take" the property in any
> sense: after all, the very existence of a permit
> system implies that permission may be granted, leaving
> the landowner free to use the property as desired.
> Moreover, even if the permit is denied, there may be
> other viable uses available to the owner. Only when a
> permit is denied and the effect of the denial is to
> prevent "economically viable" use of the land in
> question can it be said that a taking has occurred.

474 U.S. 121, 126-27 (1985).

Plaintiff argues that economic harm is a factual question that may not be determined at the pleadings stage. There is no dispute, however, that the scope of the injunction is limited and is the result of the CPG application. The PUC reads Vermont law to prohibit site preparation as long as the application is pending. If the application is denied or withdrawn, the injunction will presumably be lifted and Plaintiff, or a subsequent buyer, will be able to make other lawful uses of the property. Moreover, Plaintiff is currently using the land for one of the uses allegedly intended at the time its purchase: development of solar facilities. Accordingly, the Court cannot find that, as alleged in the FAC, the PUC's injunction "prevents all uses" of the property. ECF No. 10 at 36, ¶ 173.

With respect to reasonable, investment-backed expectations, the purpose of that factor "is to limit recovery to owners who could demonstrate that they bought their property in reliance on

a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (citation omitted).  Here, Allco availed itself of an existing statutory scheme, and Plaintiff has been ordered to comply with the PUC's interpretation of that scheme.  *Cf. Martin v. Town of Simsbury*, 505 F. Supp. 3d 116, 133 (D. Conn. 2020) ("the Plaintiff himself is the architect of the situation in which he finds himself"), *aff'd*, 2022 WL 244084 (2d Cir. Jan. 27, 2022).

The FAC alleges that at the time the property was purchased, Vermont was more "solar friendly" than in more recent years.  Assuming the truth of that assertion, any alleged change in approach by the State did not alter the statute currently being enforced.  Indeed, because the provision barring site preparation pre-dated the pending CPG application, Plaintiff cannot now claim that its reasonable expectations for solar development, or any other activity that would require clearing in violation of 30 V.S.A. § 248(a)(2)(A), have been "taken." *See Allen*, 100 F.3d at 262; *see also, e.g., Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 800-01 (Fed. Cir. 1993) (holding that Army Corps of Engineers' order requiring owner to cease and desist filling wetlands without a permit was the "type of regulatory action has been unequivocally held not to effect a taking").  If Plaintiff disagrees with the PUC's basis for

27

asserting jurisdiction, or its current interpretation of the
scope of Section 248(a)(2)(A), it may bring those issues in a
state court proceeding.[9]

In assessing the third factor, character of the government
action, *Penn Central* explained that a taking "may more readily
be found when the interference with property can be
characterized as a physical invasion ... than when interference
arises from some public program adjusting the benefits and
burdens of economic life to promote the common-good."  438 U.S.
at 124.  Under 30 V.S.A. § 248(b)(5), the PUC may not issue a
CPG without first finding that the proposed facility will "not
have an undue adverse effect on aesthetics, historic sites, air
and water purity, the natural environment, the use of natural
resources, and the public health and safety."  That review must
consider factors set forth at 10 V.S.A. § 6086(a), which include
"natural beauty of the area, aesthetics, historic sites, or rare
and irreplaceable natural areas."  *Id.* § 6086(a)(8).

The PUC was presented with a finding by the Agency of
Natural Resources that Plaintiff's site clearing was endangering
rare and very rare plants.  Although Plaintiff objects to ANR's
conclusion, the question at issue here is not whether the plants
were in fact rare or endangered, but whether the PUC's response

---

[9] The PUC notes that the injunction is being appealed to the
Vermont Supreme Court.  ECF No. 19 at 34 n.7.

was unconstitutional.  The purpose of Section 248(b)(5) is clearly to "promote the common-good" with respect to aesthetic and environmental considerations.  *Penn Central*, 438 U.S. at 124.  And while Plaintiff contends that the PUC Commissioners were acting with personal animus against Melone, the "character" of the injunction was enforcement of a state statute aimed at protecting environmental and public health concerns. Consequently, as a matter of federal constitutional law, the Court cannot find that the government function at issue here went "too far."  *Lingle*, 544 U.S. at 537.

The Second Circuit has explained that government actions are considered regulatory takings when they visit "affirmative exploitation" on affected parties, as opposed to "negative restrictions."  *Buffalo Tchrs*., 464 F.3d at 375.  Here, Plaintiff complains of a temporary, negative restriction on its property with no indication of exploitation by the State.  Such actions do not constitute a regulatory taking, *see, e.g., Everest Foods Inc. v. Cuomo*, 585 F. Supp. 3d 425, 443 (S.D.N.Y. 2022) ("Courts are wont to find a taking when the restrictions are 'temporary,' 'prospective in application,' and consist of 'negative restriction[s] rather than ... affirmative exploitation[s] by the state.'") (quoting *Buffalo Tchrs*., 464 F.3d at 375); *Luke's Catering Serv., LLC v. Cuomo*, 485 F. Supp. 3d 369, 386 (W.D.N.Y. 2020) ("the character of the government

action here is a temporary and proper exercise of the police power to protect the health and safety of the community"), and Count I of the FAC is dismissed.

**VI.  Abuse of Process**

Defendants also argue that Plaintiff has failed to state a plausible abuse of process claim.  Under Vermont law, "a plaintiff alleging the tort of abuse of process must plead and prove: 1) an illegal, improper or unauthorized use of a court process; 2) an ulterior motive or an ulterior purpose; and 3) resulting damage to the plaintiff."  *Jacobsen v. Garzo*, 542 A.2d 265, 268 (Vt. 1988).  Here, Plaintiff alleges that Commissioners Roisman and Cheney abused the PUC's judicial process by *sua sponte* issuing the injunction without jurisdiction and with the "ulterior or illegitimate purpose to run Melone out of Vermont and squash the Chelsea and Apple Hill solar projects and in all events cause Plaintiff and Melone more economic harm."  ECF No. 22 at 18.

The Vermont Supreme Court has made clear that the elements of an abuse of process claim "are separate and distinct." *Jacobsen*, 542 A.2d at 268.  Consequently, where a plaintiff alleges the defendant took legal action "for an ulterior purpose or improper motive," there will be no liability so long as the court process was used properly.  *Id.; see Weinstein v. Leonard*, 2015 VT 136, ¶ 22 (noting that "[e]ven if used to satisfy

malicious intentions," the proper use of legal process "is not
actionable").  In other words, "there is no liability where the
defendant has done nothing more than carry out the process to
its authorized conclusion, even though with bad intentions."
*Jacobsen*, 542 A.2d at 267 (citation omitted).

In support of its claim that Defendants made an
unauthorized use of the process, Plaintiff argues, as it did in
opposition to judicial immunity, that the CPG applicant was not
a "company" and that jurisdiction was therefore lacking.  ECF
No. 22 at 18.  As discussed above, the PUC considered its
jurisdiction and determined that it could impose an injunction.
In its motion to dismiss, the PUC notes that its own rules
outline the process for issuing temporary restraining orders and
injunctions.  ECF No. 19 at 31 (citing VPUC Rule 2.406).  While
the PUC's jurisdiction determination can be challenged at the
state level, it did not constitute an illegal or unauthorized
use of a court process.

Because there was no improper use of the PUC adjudication
process, the Court need not reach Plaintiff's claim of improper
motive.  *See Weinstein*, 2015 VT 136, ¶ 22.  Count II is
therefore dismissed for failure to state a claim.

## VII.  Right to a Jury Trial

Plaintiff's final claim is that Defendants denied it the
right to a jury trial.  To the extent Plaintiff is asserting a

right under the U.S. Constitution's Seventh Amendment, the
Seventh Amendment has never been applied to state proceedings.
*McDonald v. City of Chicago*, 561 U.S. 742, 765 n.13 (2010).  The
guiding provision in Vermont is Article 12 of the Vermont
Constitution, which requires a jury trial for legal, but not
equitable, proceedings.  *See State v. Irving Oil Corp.*, 2008 VT
42, ¶ 1 (concluding that environmental-enforcement action was
"essentially equitable in nature" and did not trigger the right
to a trial by jury).

Plaintiff submits that even assuming the PUC's injunction
focused on equitable relief, the assessment of a civil penalty
required a jury trial.  The case law does not support
Plaintiff's position.  When considering the scope of Article 12,
Vermont looks to the U.S. Constitution.  *Id.*, ¶ 5.  The United
States Supreme Court has held that the Seventh Amendment "was
designed to preserve the basic institution of jury trial in only
its most fundamental elements*." Galloway v. United States*, 319
U.S. 372, 392 (1943).  In *Tull v. United States*, the Court
determined that "[t]he assessment of a civil penalty is not one
of the 'most fundamental elements.'"  481 U.S. 412, 426 (1987).
*Tull* reasoned that an action for civil penalties usually seeks
an amount fixed by the legislature, and "thus cannot be said to
involve the 'substance of a common-law right to a trial by
jury,' nor a 'fundamental element of a jury trial.'"  *Id.; see*

32

*also Irving Oil Corp.*, 2008 VT 42, ¶ 18 ("A review of the statutory factors to be considered by a court in fixing the amount of any civil penalties in an action of this nature underscores their essentially equitable character.").  Plaintiff thus had no right to a jury trial in the proceedings before the PUC.  Had those proceedings been heard by a state court, rather than by an administrative agency, the same legal principles would apply and the result would be no different.  Count III of the FAC is dismissed.

## Conclusion

For the reasons set forth above, Defendants' motion to dismiss (ECF No. 19) is granted.  Defendants' initial motion to dismiss (ECF No. 9), filed prior to the filing of the FAC, is denied without prejudice as moot.  This case is dismissed.


DATED at Burlington, in the District of Vermont, this 12th day of March, 2024.


/s/ William K. Sessions III
Hon. William K. Sessions
U.S. District Court Judge